**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

TAMARA R.,[1]

                    Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner, Soc. Sec. Admin., in
official capacity,

                    Defendant.

Case No. 3:20-cv-00307-TMB

## DECISION AND ORDER

On or about August 6, 2018, Tamara R. ("Plaintiff") protectively filed applications for disability insurance benefits ("SSDI") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"),[2] alleging disability beginning June 3, 2018.[3] Plaintiff has exhausted her administrative remedies and filed a Complaint

---

[1] Plaintiff's name is partially redacted in compliance with Fed. R. Civ. P. 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brings claims under Title II and Title XVI. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 15. The record appears to contain only the application summary, not the application itself. The application summaries list August 13, 2018 as the application date for SSDI and September 20, 2018 for SSI. A.R. 245, 247.

seeking relief from this Court.[4]  Plaintiff's opening brief asks the Court to vacate the Commissioner's decision and remand for a directed finding of disability and calculation of benefits, or in the alternative, remand for further administrative proceedings.[5]  The Commissioner filed an Answer and a brief in opposition to Plaintiff's opening brief.[6]  Plaintiff filed a reply brief on August 30, 2021.[7]  Oral argument was not requested and was not necessary to the Court's decision.  On August 11, 2021, Defendant Commissioner Saul was substituted by Acting Commissioner Kilolo Kijakazi pursuant to Federal Rule of Civil Procedure 25(d).[8]  This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[9]  For the reasons set forth below, Plaintiff's request for relief is granted in part.

## I.     STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[10]  "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[4] Docket 1 (Plaintiff's Compl.).

[5] Docket 19 (Plaintiff's Br.).

[6] Docket 12 (Answer); Docket 20 (Defendant's Br.).

[7] Docket 21 (Reply).

[8] Docket Annotation (August 11, 2021).

[9] 42 U.S.C. § 405(g).

[10] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 2 of 25

conclusion."[11] Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[12] In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[13] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[15] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[17] In particular, the

---

[11] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

[12] *Richardson*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[17] *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[18]

## II.   DETERMINING DISABILITY

The Social Security Act ("the Act") provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[19]  In addition, Supplemental Security Income ("SSI") may be available to individuals who do not have insured status under the Act but who are age 65 or older, blind, or disabled.[20]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[21]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[22]

---

[18] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

[19] 42 U.S.C. § 423(a).

[20] 42 U.S.C. § 1381a.

[21] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[22] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 4 of 25

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[23] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[24] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[25] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[26] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[27] *The ALJ determined that Plaintiff had not engaged in substantial activity since June 3, 2018, the alleged onset date.*[28]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the

---

[23] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[24] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[25] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[26] *Tackett*, 180 F.3d at 1101.

[27] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[28] A.R. 18.

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 5 of 25

twelve-month duration requirement.[29]  *The ALJ determined that Plaintiff had the following severe impairments: neurocognitive disorder; persistent depressive disorder; hypertension; retinopathy; renal insufficiency; unspecified white matter disease; Meniere's disease; and lumbar and cervical degenerative disc disease.  The ALJ determined that Plaintiff's leukoencephalopathy, or CADASIL, and multiple sclerosis were not medically determinable impairments.  The ALJ also determined that Plaintiff's surgically removed parotid mass and restless leg syndrome were non-severe impairments.[30]*

**Step 3.**  Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.[31]  *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[32]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC

---

[29] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[30] A.R. 18–20.

[31] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[32] A.R. 20.

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 6 of 25

assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[33] *The ALJ determined that Plaintiff had the RFC to perform light work with the following exceptions: standing and walking for up to four hours and sitting for up to six hours in an eight-hour workday with normal breaks; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; avoiding concentrated exposure to extreme cold, extreme heat, and excessive vibration; avoiding moderate exposure to excessive noise, operational control of moving machinery, unprotected heights, and hazardous machinery; and performing simple, routine, and repetitive tasks with only occasional decision-making and occasional changes to the work setting.[34]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[35] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that Plaintiff was not capable of performing any past relevant work.[36]*

---

[33] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[34] A.R. 22.

[35] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[36] A.R. 33.

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 7 of 25

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[37] *The ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including counter clerk (DOT #249.366-010), production assembler (DOT #706.687-00), and inspector and hand-packager (DOT #559.687-074).*[38]

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from June 3, 2018, the alleged onset date, through June 11, 2020, the date of the ALJ's decision.[39]

## III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was 40 years old on the alleged onset date.[40] She testified to last working full-time in 2018 as a bartender, food server, and restaurant manager. In the past, she worked as a vestibular technician and a caterer. Plaintiff testified that she also performed as a singer in two different bands after the alleged onset date, but the ALJ found that this work did not constitute substantial gainful activity.[41] On May 2, 2019, the Social Security Administration ("SSA") determined that Plaintiff was not disabled under the applicable

---

[37] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[38] A.R. 34.

[39] A.R. 34–35.

[40] A.R. 245.

[41] A.R. 18, 33, 71–75.

rules.[42]  On November 26, 2019, Plaintiff appeared and testified without representation before ALJ Cecilia LaCara in Anchorage, Alaska.  The ALJ continued the hearing to allow Plaintiff to complete the medical record.[43]  On March 2, 2020, Plaintiff again appeared and testified before ALJ Cecilia LaCara without representation.[44]  On June 11, 2020, the ALJ issued an unfavorable ruling.[45]  On October 21, 2020, the Appeals Council denied Plaintiff's request for review.[46]  On December 17, 2020, Plaintiff appealed the Commissioner's final decision to this Court.[47]

## IV.    DISCUSSION

Plaintiff is represented by counsel in this appeal.  In her opening brief, Plaintiff alleges that the ALJ erred by: (1) failing to properly weigh the opinion of Paul Craig, Ph.D., and erroneously adopting the opinion of testifying expert Cheryl Beuchner, resulting in a failure to find Plaintiff disabled at Step Three or include all of Plaintiff's limitations in the RFC and (2) failing to provide specific, clear, and convincing reasons for discounting Plaintiff's symptom testimony.[48]  The Commissioner disputes Plaintiff's arguments and

---

[42] A.R. 127–28.

[43] A.R. 44–49.

[44] A.R. 69–80.

[45] A.R. 12–35.

[46] A.R. 1–5.

[47] Docket 1.

[48] Docket 19 at 15–25.

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 9 of 25

asks this Court to affirm the agency's determination.[49]

A. <u>Medical Opinions</u>

Plaintiff applied for Title II and Title XVI benefits on or about August 6, 2018, so the new regulations apply to her claim.[50]  Under the new regulations, the definition of what constitutes a medical opinion has narrowed, focusing on what the claimant can do despite her impairments and what work-related limitations are present.[51]  The new regulations define a medical opinion as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> (i)  Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii)  Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii)  Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv)  Your ability to adapt to environmental conditions, such as temperature or fumes.[52]

---

[49] Docket 20 at 4–14.

[50] A.R. 15.

[51] *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1513(a)(2).

[52] 20 C.F.R. § 404.1513(a)(2).

The new regulations provide that the ALJ no longer gives any particular weight to a medical opinion based on its source, thereby eliminating the treating source rule.[53] Instead, the ALJ considers the persuasiveness of a medical opinion based on five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, extent, and type of treatment; (4) specialization; and (5) other relevant factors that support or contradict the medical opinion.[54] Supportability and consistency are considered the most important factors for evaluating persuasiveness.[55] Supportability and consistency are explained as follows in the regulations:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[56]

Generally, these are the only two factors the ALJ is required to address in her decision.[57] However, when two or more medical opinions or prior administrative medical findings

---

[53] *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844-01 (Jan. 18, 2017), 2017 WL 168819, at *5867–68; 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (for claims filed on or after March 27, 2017).

[54] 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

[55] The regulations state, "The factors of supportability . . . and consistency . . . are the most important factors [the SSA] consider[s] when [the SSA] determine[s] how persuasive [the SSA] find[s] a medical source's medical opinions or prior administrative medical findings to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (for claims filed on or after March 27, 2017).

[56] 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

[57] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("[W]e will explain how we considered the

"about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ must explain how "the other most persuasive factors" were considered.[58]

### 1. *Paul Craig, Ph.D.*

On March 12, 2020, Paul Craig, Ph.D., performed an abbreviated neuropsychological screening examination of Plaintiff. He noted Plaintiff had been diagnosed with CADASIL.[59] As part of his evaluation, Dr. Craig performed a battery of neuropsychological tests.[60] Based on these tests, he opined that Plaintiff did not "evidence clouding of consciousness" and that her "rudimentary attention and concentration appear to be intact to the extent she can recite five digits forward and four digits backward." However, he also opined that Plaintiff's memory and executive function skills were very limited and that Plaintiff met the diagnostic criteria for a neurocognitive disorder due to CADASIL. Dr. Craig opined that Plaintiff did not have the mental ability to function in any job setting; that her capacity to voluntarily agree to legal issues was questionable given her "current level of neurocognitive impairment"; and that she was "not

---

supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.").

[58] 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (for claims filed on or after March 27, 2017).

[59] CADASIL (Cerebral Autosomal Dominant Arteriopathy with Subcortical Infarcts and Leukoencephalopathy) is a hereditary autosomal dominant disease affecting the small cerebral arteries. It causes subcortical infarcts and damages the white matter (leukoencephalopathy). CADASIL is diagnosed by an MRI scan and confirmed by genetic testing. *See* https://www.cadasilfoundation.org/what.html (last visited February 9, 2022).

[60] Tests included the WAIS-IV symbol search, coding, digit span, and letter/number sequencing; COWA; Category Fluency; Boston Naming Test; Aphasia Screening Test; CVLT II and III tests; Rey Complex Figure Test; Wisconsin Card-Sorting Test; and Trails A and B. A.R. 741.

capable of meeting her own survival needs without others providing structure, guidance, and support for her during her day to day life."[61]

The ALJ provided several reasons for discounting Dr. Craig's opinions. First, the ALJ found that while Dr. Craig diagnosed CADASIL as the cause of Plaintiff's neurocognitive deficits, Dr. Craig did not perform genetic testing and did not acknowledge that the CADASIL diagnosis was provisional.[62] This determination is insufficient for several reasons. Dr. Craig's expertise was neuropsychology, not genetics, and the tests he performed were neuropsychological tests.[63] Additionally, as shown in the record, objective findings showed changes consistent with CADASIL and Plaintiff exhibited symptoms associated with CADASIL.[64] Moreover, Plaintiff could not afford the genetic testing necessary to confirm the diagnosis.[65] But, as one treating provider stated, "[i]t does not really matter as there is no cure for this autosomal dominant vascular disease."[66]

---

[61] A.R. 740–42.

[62] A.R. 28, 32.

[63] A.R. 740.

[64] On October 11, 2019, Breana Taylor, M.D., with Harborview Stroke Clinic, evaluated Plaintiff. Dr. Taylor noted that she suspected CADASIL based on a recent MRI of the brain. She noted that CADASIL was a progressive disease without a cure. Dr. Taylor recommended genetic testing for diagnosis. A.R. 731–38. A follow up MRI of the brain on April 10, 2020 showed changes consistent with CADASIL in the appropriate clinical setting. A.R. 743.

[65] A.R. 695 ("[Plaintiff] cannot afford the genetic testing."); *see Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir. 1995) ("Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds.").

[66] On January 9, 2020, Lisa Cooney, M.D., noted that Plaintiff's "diagnosis of CADASIL does explain her medical issues as well as her family's issues. She cannot afford the genetic testing. It really does not matter as there is no cure for this autosomal dominant vascular disease." A.R. 694–95.

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 13 of 25

In sum, discounting Dr. Craig's opinion because he did not acknowledge that Plaintiff's CADASIL diagnosis had not been confirmed was not a sufficient reason for discounting Dr. Craig's opinion under the SSA's new regulations.

Second, the ALJ determined that Dr. Craig's opinion was inconsistent with the medical record. Specifically, the ALJ found that Dr. Craig's assessment conflicted with the "normal cognitive findings in neurological examinations and generally unremarkable mental status findings."[67] However, the ALJ did not explain how these "normal" and "unremarkable" findings in treatment notes by physicians who provided care for Plaintiff's physical impairments undermined Dr. Craig's opinion that Plaintiff met diagnostic criteria for a neurocognitive disorder based on his specific testing and expertise.[68]

Third, the ALJ discounted Dr. Craig's opinion as inconsistent with Danelle Winn, Ph.D.'s, psychological evaluation of Plaintiff in April 2019. However, other than noting that Dr. Craig did not perform a full WAIS IV test and Dr. Winn included a full WAIS IV test and mental status report in her evaluation, the ALJ did not articulate the inconsistencies or significance of any conflict between Dr. Craig's and Dr. Winn's opinions.[69] Moreover, substantial evidence does not support the ALJ's findings. While Dr. Winn's and Dr. Craig's conclusions regarding the severity of Plaintiff's neurocognitive disorder differed, the two evaluators' objective test results showed Plaintiff had difficulties with visual processing

---

[67] A.R. 28.

[68] A.R. 28, 741.

[69] A.R. 28. *See* 20 C.F.R. § 404.1520c(a)–(b).

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 14 of 25

speed, visual attention and concentration, cognitive flexibility, and executive thinking.[70]

In addition to Dr. Craig, Dr. Winn and treating physicians Dr. Hines, Dr. Beal, and Dr. Urban, all opined that Plaintiff's leukoencephalopathy was likely progressive.[71]

Fourth, the ALJ discounted Dr. Craig's opinion because Dr. Craig's evaluation did not address the role of Plaintiff's marijuana use in her cognitive functioning and did not provide findings as to Plaintiff's mental-status presentation.[72] However, the ALJ does not explain how these undermine Dr. Craig's opinion. Moreover, Plaintiff's testimony and medical records indicate that Plaintiff's marijuana use was more limited than the ALJ suggested.[73] In this context, it is not clear how Dr. Craig's failure to account for Plaintiff's

---

[70] Both evaluators performed the Trail Making Test Forms A and B. A.R. 566–67, 741. Dr. Winn opined that Plaintiff's visual processing speed as a "significant cognitive deficit[ ] that would likely limit the types of employment that she would be intellectually capable of as she would have pronounced difficulties with work tasks that would demand even a low average level of visual attention and concentration." Dr. Winn then concluded that Plaintiff met criteria for a "Mild Neurocognitive Disorder Due to Another General Medical Condition." A.R. 569. Dr. Craig opined that Plaintiff memory and executive functioning skills were "very limited" and that Plaintiff met diagnostic criteria for a neurocognitive disorder due to CADASIL. A.R. 741.

[71] A.R. 541 (Dr. Urban opined that Plaintiff's severe leukoencephalopathy was contributing to Plaintiff's ataxia and may be contributing to Plaintiff's exacerbated pain symptoms); 570 (Dr. Winn opined that Plaintiff needed "to be closely followed in terms of her leukoencephalopathy as she will be at high risk for further cognitive decline that may necessitate her eventually being unable to hold down any type of employment or even to live independently); 659 (Dr. Urban opined that Plaintiff was "suffering from a chronic progressive disease affecting the white matter of her central and peripheral nervous system"); 663 (Dr. Hines opined that "the prognosis of [Plaintiff's] health will continue to decline over time."); 683 (Dr. Beal opined that Plaintiff had adult leukoencephalopathy "for which there is no known treatment and leads to early death.").

[72] A.R. 28, 32. On March 12, 2020, Dr. Craig noted that Plaintiff reported smoking marijuana daily. A.R. 740.

[73] A.R. 77 (Plaintiff testified that she uses only CBD without THC.); A.R. 395 (started to use "marijuana oil"); A.R. 557 (uses CBD oil, which does have some THC in it). Although providers noted tobacco use, there do not appear to be any other references to smoking marijuana in the record. *E.g.,* A.R. 377, 403, 406, 496, 498, 605, 679.

marijuana use undermines his opinion about the severity of Plaintiff's conditions.

Finally, the ALJ discounted Dr. Craig's opinion as inconsistent with Plaintiff's activities.[74] For the same reasons as set forth below, the ALJ failed to articulate adequate reasons for finding Dr. Craig's opinion unpersuasive based on Plaintiff's reported activities.

The ALJ must articulate how she considered the supportability and consistency factors in addressing the persuasiveness of a medical opinion.[75] In this case, the reasons provided by the ALJ for discounting Dr. Craig's opinion do not adequately address the factors contemplated by the new SSA regulations and are not supported by substantial evidence.[76] As a result, all of Plaintiff's functional limitations may not be included for evaluation at Step Three or included in the RFC, in particular, the effect of Plaintiff's physical conditions on her cognitive functioning.[77] The Court reverses and remands for further proceedings on this issue.

2. *Cheryl Beuchner*

Cheryl Beuchner, a psychologist, testified at Plaintiff's second hearing on March 2, 2020. She opined that Plaintiff's records showed "some mild neurocognitive issues or symptoms" and persistent depressive disorder. Dr. Beuchner also opined that Plaintiff did

---

[74] A.R. 32.

[75] 20 C.F.R. § 404.1520c(a)–(b).

[76] *Garrison,* 759 F.3d at 1010 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [s]he did not rely.") (internal citation omitted).

[77] *Brown-Hunter,* 806 F.3d at 492.

not meet or medically equal a listing based on the "B" criteria for mental impairments. Specifically, Dr. Beuchner opined that Plaintiff's ability to understand, remember, and apply information was moderately limited; her ability interact with others was mildly limited; her ability to concentrate, persist, and maintain pace was moderately limited; and her ability to adapt or manage herself was mildly to moderately limited. Dr. Beuchner concluded that Plaintiff would need routine, repetitive type tasks with not a lot of changes or complex problem solving to account for Plaintiff's limitations in perceptual speed and cognitive flexibility.[78]

Plaintiff argues that the ALJ erroneously adopted Dr. Beuchner's opinion, which did not take Dr. Craig's opinion into account.[79] The Commissioner does not directly address Plaintiff's argument regarding Dr. Beuchner.[80]

Because Dr. Craig performed his evaluation on March 12, 2020, approximately ten days after the hearing date, Dr. Beuchner did not have the benefit of reviewing Dr. Craig's neuropsychological examination.[81] On remand, the ALJ will be able to elicit new medical expert testimony or interrogatories that include an expert medical review of Dr. Craig's evaluation and opinion.

B. Symptom Testimony

---

[78] A.R. 58–62.

[79] Docket 19 at 21–22.

[80] Docket 20.

[81] A.R. 53, 740.

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 17 of 25

As set forth above, Plaintiff testified without representation at two hearings before the ALJ. At the second hearing, Plaintiff testified that she took five different medications to control her hypertension and took Valium for anxiety, Flexeril for pain, and gabapentin for nerve pain, but continued to hurt all over. She related that she had a driver's license, but that she did not drive. She stated that she did not wake before 11:00am, was exhausted by home activities by 3:00 or 4:00pm, and went to bed by 9:00pm. She testified that she sang in two bands, but she could not always make it to the performances and that she required two days of recovery after each performance.[82] Plaintiff also filed a function report in March 2019. In the report, she stated that she had lost feeling in her left leg, had lost all vision in her right eye, and had no depth perception. Plaintiff reported having extremely low energy and chronic pain and fatigue. She reported spending most of her day in pajamas and that household chores took all day. She stated she was able to prepare simple meals. Plaintiff also reported that she stopped driving due to her vision problems, that neuropathy in her leg and blood pressure medications made stair climbing difficult, her depth perception problems made it difficult to walk in uneven terrain, and her memory and concentration were "just mush."[83]

An ALJ's assessment of a claimant's symptoms has two steps.[84] First, the ALJ determines whether the claimant has presented "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other

---

[82] A.R. 69–80.

[83] A.R. 286–94.

[84] *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).

Case No. 3:20-cv-00307-TMB
Decision and Order
Page 18 of 25

symptoms alleged."[85]  In the first step, the claimant need not "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.  Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof."[86]  Here, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms that Plaintiff described.[87]

Second, if the claimant has satisfied step one and the ALJ has determined that the claimant is not malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms.[88] This standard is "the most demanding required in Social Security cases."[89]  Here, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were inconsistent with the medical evidence and other evidence in the record.[90]

Plaintiff alleges that the ALJ committed legal error in two ways.  First, Plaintiff argues that the ALJ's rejection of Plaintiff's testimony constituted legal error because "providing a summary of medical evidence . . . is not the same as providing clear and

---

[85] *Id.* (quoting *Garrison,* 759 F.3d at 1014–15).

[86] *Garrison,* 759 F.3d at 1014–15 (internal citations and quotations omitted).

[87] A.R. 23.

[88] *Trevizo,* 871 F.3d at 678.

[89] *Id.*

[90] A.R. 23.

convincing reasons for finding the claimant's symptom testimony not credible."[91] Plaintiff also argues that the ALJ failed to show that Plaintiff's occasional activities contradicted her testimony or that they transferred to work skills.[92] The Commissioner contends that the medical record contradicted the severity of Plaintiff's symptoms and Plaintiff's activities undercut her claims.[93]

An ALJ may reject symptom testimony if it is contradicted by the medical evidence, but the ALJ "may not discredit the claimant's subjective complaints solely because the objective evidence fails to fully corroborate the degree of pain alleged."[94] Here, the ALJ reasoned that Plaintiff's reported symptoms were "out of proportion" to the objective evidence.[95] The ALJ noted that the medical evidence "as a whole is not consistent with the claimant's allegations, such as severe limitations in walking, loss of left-leg feeling, extreme low energy, significantly worsened balance problems, or chronic intense body-wide pain."[96]

To support her conclusion that Plaintiff's symptoms were inconsistent with the objective evidence, the ALJ pointed to physical examination findings showing a normal walking gait, intact coordination, normal cranial-nerve exam, normal motor strength, intact

---

[91] Docket 19 at 23 (quoting *Lambert v. Saul,* 980 F.3d 1266, 1278 (9th Cir. 2020)).

[92] Docket 19 at 24.

[93] Docket 20 at 5–7.

[94] *Coleman v. Saul,* 979 F.3d 751, 756 (9th Cir. 2020) (citing *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998)).

[95] A.R. 23–28.

[96] A.R. 26.

and symmetrical reflexes, intact sensation, that Plaintiff was alert and fully oriented, and that Plaintiff was in no acute distress.[97] The ALJ took note of the "1" mRS rating from October 2019, indicating "[n]o significant disability despite symptoms; able to carry out all usual duties and activities."[98]

However, the ALJ did not review Plaintiff's treatment records in the context of Plaintiff's overall diagnostic record, electing to focus on the normal physical examinations in the record to discredit Plaintiff's testimony.[99] Read as a whole, the treatment notes show that Plaintiff suffered from uncontrolled hypertension and its effects over much of the relevant period. Despite mostly unremarkable physical examinations, Plaintiff's imaging and other objective findings show cerebral and brainstem white matter disease provisionally diagnosed most recently as CADASIL, degenerative changes in the cervical and lumbar spine requiring epidural injections and other pain management, instances of an unstable gait and reduced muscle strength, impaired vision, and vertigo.[100] Moreover,

---

[97] A.R. 26.

[98] A.R. 24, 731–32 (provisional diagnosis of CADASIL, mRS of 1 indicating no significant disability despite symptoms and able to carry out all usual duties and activities).

[99] *Trevizo,* 871 F.3d at 680 (citing *Ghanim v. Colvin,* 763 F.3d 1154, 1164 (9th Cir. 2014) ("[T]he treatment records must be viewed in light of the overall diagnostic record.").

[100] *E.g.,* A.R. 393 (concern for multiple sclerosis with vision changes and parasthesias); A.R. 396 (solumedrol infusion and hypertensive during infusion); A.R. 398 (presented with left sided numbness and visual disturbance); A.R. 403 (diagnosed with branch retinal vein occlusion with macular edema OD, hypertensive retinopathy OU, blunt ocular trauma OU, Sequela); A.R. 406–09 (presented to emergency room with headache and lightheadedness, CT scan showed stable appearance of white matter disease); A.R. 416 (MRI of brain showing dramatic cerebral and brainstem white matter disease with reported headaches and speech disturbances); A.R. 467 (imaging showed severe spondylosis at C5-6); A.R. 468–71 (uncontrolled high blood pressure, reported chronic headaches, numbness in left leg and in fingers); A.R. 479–80 (mildly unstable gait, reported posterior headaches); A.R. 482 (mildly unstable gait, imaging showed severe periventricular white matter disease); A.R. 510 (degenerative changes at C5-6 resulting in mild

the ALJ failed to address Plaintiff's consistent reports of headaches, weakness and numbness, vision changes, balance problems and dizziness, episodic neurological symptoms, and pain to medical providers during the relevant period.[101]

The ALJ also reasoned that the record evidence showed Plaintiff's activities and abilities were inconsistent with her allegations. The ALJ noted Plaintiff's trip to Florida to visit friends then to Washington to visit her mother in September 2018; Plaintiff's report that she had attended a rock concert; a report that Plaintiff could play the piano for 20 to

---

spinal stenosis with severe left and mild right neural foraminal stenosis); A.R. 512–13 (MRI showed extensive white matter signal abnormality concerning for possible demyelinating disease, although dysmyelinating syndrome or metabolic abnormality causing adult leukoencephalopathy should also be considered); A.R. 520–23 (impaired visual fields, reduced muscle strength, impaired tandem walking, impaired walking on toes and heels); A.R. 527 (uncontrolled hypertension, reported legally blind in right eye and losing vision in left eye); A.R. 529 (uncontrolled hypertension, losing sight in left eye, back pain); A.R. 543 (mild gait instability, positive Romberg with significant body sway); A.R. 546 (epidural steroid injection for C5-C7); A.R. 557–58 (poor tandem gait; "look[ed] better than her MRI scan (which is indeed impressive)," diminished vision in right eye, high frequency hearing intact, but prone to ataxia and vertigo); A.R. 585 (renal function progressively worsening); A.R. 620 (lumbar epidural steroid injection); A.R. 626–630 (cervical branch blocks); A.R. 667 (positive Romberg, difficulty with tandem walk); A.R. 681–82, 684 (treated for dizziness and vertigo); A.R. 743 ("stable extensive FLAIR hyperintensity throughout the cerebral white matter and pons, consistent with CADASIL in the appropriate clinical setting.").

[101] *E.g.,* A.R. 395 (reported symptoms included fatigue, dizziness, decrease in vision, and pain in joints in limbs); A.R. 400 (reported vision changes and weakness in the left leg with high blood pressure reading at appointment); A.R. 438 (reported headache for five days and unable to get out of bed a few days and episodes of neuropathy/parathesias, high blood pressure reading at appointment); A.R. 447 (reported worsening left eye vision); A.R. 450–53 (high blood pressure reading at appointment with reported headaches and speech and vision changes); A.R. 458–59 (resistant HTN and HTN retinopathy, reported headaches, weakness, numbness, dizziness and balance issues, and joint pain); A.R. 498 (reported "tunnel vision" in left eye and difficulty reading text messages); A.R. 514, 516 (reported dizziness, referred to pain management for back); A.R. 579–82 (reported feeling tired, but busy with her band, memory was poor, improved blood pressure and no longer having headaches); A.R. 686 (reported decreased energy level, sleeping poorly); A.R. 695 (reported could not afford genetic testing to confirm CADASIL); A.R. 697–98 (feeling well despite moderate headache, blood pressure very difficult to control with cerebral changes); A.R. 710 (reported feeling tired, had been teaching herself to play piano but ended up with shoulder pains).

30 minutes without significant neck or extremity pain; and Plaintiff's reports that she was able to sing in bands and tour in a recreational vehicle to summer festivals.[102]

"[D]aily activities may be grounds for an adverse credibility finding if a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."[103] However, in this case, the Plaintiff's testimony and reports reflect limited activities. As set forth above, Plaintiff testified that her music performance activities were limited and required two days of rest between performances. She testified that the motorhome she traveled in for summer performances "was nice because I could rest in between" performances.[104] And, although the ALJ concluded that Plaintiff's activities indicated that she had the mobility, strength, motor skills, and tolerance for sitting, standing, and walking necessary for traveling, navigating airports, taking long cross-country flights, and attending a double-bill rock concert, it appears from the record that Plaintiff took only one trip during the relevant period.[105] Moreover, the ALJ did not inquire whether Plaintiff required assistance with travel on her trip. In sum, the ALJ did not adequately explain how Plaintiff's daily activities would translate into an ability to work full time.

The ALJ's stated reasons for rejecting Plaintiff's symptom testimony failed to meet the clear and convincing standard. Therefore, the ALJ did not offer specific, clear, and

---

[102] A.R. 28–29.

[103] *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007) (quotations and citations omitted).

[104] A.R. 79.

[105] A.R. 29, 691 (reported intended to travel to Florida to visit friends and to Washington to visit mother. She also planned to go to a rock concert).

convincing reasons for rejecting Plaintiff's testimony. The Court also reverses the ALJ on this basis and will remand for further proceedings.

C. <u>Scope of Remand</u>

Plaintiff asks the Court to vacate the final agency decision and remand for the immediate calculation of benefits or remand for further administrative proceedings.[106] The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[107] For the above reasons, the proper remedy is reversal and remand for further administrative proceedings consistent with this opinion. At a minimum, the ALJ should reevaluate all of the medical opinions, take additional medical expert testimony as necessary, clarify Plaintiff's testimony regarding her pain and other symptoms and her daily activities, and issue a new decision with appropriate findings at each step of the sequential evaluation. The ALJ should have additional evaluations performed and contact Plaintiff's treating physicians for clarification as necessary.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and are not supported by substantial evidence

---

[106] Docket 19 at 25.

[107] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

in the record.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 19 is GRANTED and this matter is REMANDED for further proceedings consistent with this order.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 25th day of February, 2022 at Anchorage, Alaska.

*/s/ Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE
